**Juan C. Chavez**, OSB #136428
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Attorney for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVIVION

| | |
|---|---|
| MICHAEL BENSON, | Case No. |
| Plaintiff, | |
| v. | COMPLAINT |
| STATE OF OREGON, WARREN ROBERTS, CARRIE COFFEY, and JOHN DOES 1-50. | Civil Rights Action (42 U.S.C. § 1983); and State Torts (Negligence). |
| Defendants. | *JURY TRIAL DEMANDED* |

**INTRODUCTION**

1.    This is a civil rights action brought by plaintiff, Michael Benson, a state prisoner pursuant to 42 U.S.C. § 1983 and the Oregon Tort Claims Act. Plaintiff alleges that during his time incarcerated in the Oregon Department of Corrections (ODOC) the Defendants continuously denied him necessary medical care. Upon release on March 8, 2024, he was functionally immobile and wheelchair bound. Plaintiff returned to ODOC custody on January 21, 2026. He

COMPLAINT
Page 1 of 16

once again is suffering from the same, chronic lack of care from ODOC. While not the grounds for the present suit, Plaintiff anticipates that his health will further deteriorate in Defendants' care while he exhausts administrative remedies.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over plaintiff's claims for violation of federal constitutional rights, pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the cause of action arises under 42 U.S.C. § 1983, and supplemental jurisdiction under 28 U.S.C. § 1367.

3.      All of the alleged actions herein occurred in Marion County, Oregon. Venue is properly before this District of Oregon pursuant to 28 U.S.C. § 1391(b) where all of the events giving rise to these claims occurred in this judicial district and because defendants are subject to personal jurisdiction in the District Court of Oregon.

## PARTIES

4.      Plaintiff Michael Benson is, and was at all times relevant, a prisoner of the Oregon Department of Corrections.

5.      Defendant State of Oregon is a sovereign body within the United States of America with the ability to be sued pursuant to the Oregon Tort Claims Act. Defendant State of Oregon operates and controls its state departments, including the Oregon Department of Corrections.

6.      Defendant Warren Roberts was at all times relevant to this Complaint the Chief Medical Officer (CMO) of the Oregon Department of Corrections. Pursuant to OAR 291-124-0016(2), the CMO is "responsible for professional oversight of clinical healthcare providers" and holds "authority for all decisions requiring medical judgment and directly affecting outcomes of clinical practice." As CMO, Roberts' signature appeared on all ODOC Health Services Policies and Procedures, signifying his approval. He was terminated in early 2025 following an Oregon

Department of Justice investigation. He is sued in his individual capacity. At all times relevant, he was acting under color of state law.

7.    Defendant Carrie Coffey is, and was at all times relevant, a registered nurse and the Medical Services Manager for the Oregon State Penitentiary. Defendant Coffey was responsible for managing the operations of OSP's healthcare system. She is sued in her individual capacity. At all times relevant, she was acting under color of state law.

8.    Despite electronic medical records long becoming the standard in every American health care system in the 21st Century, Defendants' medical system still relies on handwritten medical records, and Plaintiff cannot identify every personal participant who may become a necessary party in this case based on their illegible signatures and handwriting. For this reason, Plaintiff sues Defendants John Does 1-50 under a fictitious name. These defendants are the ODOC medical staff who personally participated in the unconstitutional care received by Plaintiff, or who supervised or set in motion the constitutional deprivations described herein. Plaintiff reserves the right to substitute named defendants once they are identified.

## FACTUAL ALLEGATIONS

### A.  ODOC'S Medical Care System Under Defendant Roberts

9.    The Oregon Department of Corrections operates, and, at all times relevant, operated a statewide medical system, with their main offices in Salem, Oregon. Defendant Warren Roberts, in his capacity as Chief Medical Officer (CMO), oversaw that system until his termination in early 2025. All ODOC Health Services Policies and Procedures bear Roberts' signature, confirming his approval of those policies, including the policy requiring that adults in custody receive healthcare "consistent with the standard for such services in the community."

10.     ODOC Health Services policy provided that a Therapeutic Level of Care (TLC) Committee—convened approximately weekly and chaired by Roberts—would review proposed care classified as "Medically Acceptable but not Medically Necessary" or of "Limited Medical Value." By the express terms of ODOC policy, care that was Level 1 (emergent) or otherwise medically necessary could be ordered directly by any treating practitioner, including physicians and nurse practitioners, without TLC Committee approval.

11.     In practice, Roberts required all medically necessary care—including Level 1 emergent care—to be presented to and approved by the TLC Committee before treatment could proceed. Roberts made all TLC decisions unilaterally, often leaving his own signature off the relevant forms to create the appearance of genuine committee deliberation and to obscure his personal accountability for denials. As a result, adults in custody who required urgent or emergent specialist care were forced to wait for weekly TLC meetings before scheduling could begin, regardless of the severity of their condition.

12.     Even after care was approved, Roberts and ODOC leadership required outside providers to be selected only from an ODOC preferred-provider list, causing further unnecessary delays. Out-of-facility (OOF) trips—the mechanism through which adults in custody received specialist appointments outside ODOC facilities—were chronically mismanaged. The Oregon Department of Justice conducted an investigation into Roberts and ODOC leadership, the findings of which were set forth in a report (the Goldsmith Report). The Goldsmith Report confirmed that Roberts and his supervisors were aware as early as 2023 that OOF trips were not being handled correctly and that adults in custody were being denied scheduled specialist care, yet failed to correct the problem.

13. The Goldsmith Report further found that Roberts retaliated against ODOC physicians who objected to his methods by initiating complaints against them, which resulted in those physicians being placed on administrative leave and duty-stationed at home. This created critical staffing shortages across ODOC facilities and compounded the delays in care experienced by adults in custody, including Plaintiff.

14. The grievance process available to adults in custody challenging medical denials was rendered meaningless by Roberts. Under the scheme he implemented, a grievance appeal was routed first to Roberts himself—the same official responsible for the denial—who invariably upheld his own decision. A second appeal was reviewed by Roberts's supervisor, who lacked medical training and routinely deferred to Roberts's determination, providing no meaningful check on Roberts' authority to deny care.

15. Based on the Goldsmith Report and other reliable information, Roberts implemented a systemic scheme to delay and deny medically necessary care to adults in custody as a cost-control mechanism. Roberts would at times nominally approve care only when he knew an adult in custody was approaching release, ensuring that the approval would come too late for treatment to occur before the individual left ODOC custody. The only reliable means by which an adult in custody could obtain necessary medical care under Roberts's administration was through court intervention.

16. Roberts was terminated from his position in early 2025 following the Goldsmith Report investigation. It was within this deliberately dysfunctional medical system—one in which Roberts used the TLC Committee and OOF trip process as instruments of delay and denial—that Plaintiff Michael Benson suffered decades of inadequate and constitutionally deficient medical care.

### B. Plaintiff's Medical History and Denial of Care

17. Plaintiff had been in ODOC custody for decades prior to his release on March 8, 2024.

18. During his incarceration, he had been diagnosed with numerous chronic illnesses, including psoriatic arthritis, rheumatic arthritis, spine lesions, bulging discs, generalized osteoarthritis, lumbar spondylosis, Hepatitis C, Type 2 Diabetes, and GERD.

19. Plaintiff's health issues caused severe limitations in his mobility as well as deformities in his extremities.

20. His hands and fingers became so deformed that pushing a button required him to contort his fingers in a way that was extremely painful.

21. As for walking, on his right foot, he could only bear weight on his right big toe.

22. Inmate communication forms (kytes) describing his hand pain and difficulty walking date all the way back to 2005.

23. Despite having referrals to see specialized doctors outside the facility, Plaintiff had to wait months, and sometimes years, to be evaluated by properly credentialed doctors. These delays persisted to the day of his release.

24. Although Plaintiff was dealing with chronic illnesses that caused him severe pain, any time that he reached out to Health Services at the ODOC facilities he was housed it, Health Services staff would tell him to sign up for "sick call" for "evaluation of [his] symptoms." Plaintiff had no continuity of care when it came to addressing ongoing and persistent pain.

25. Plaintiff's various conditions, including post-operative care, pain management, and physical therapy, all required comprehensive plans of care to be in place. Defendants followed no plan of care for Plaintiff, despite nearly 20 years of chronic medical problems.

26. ODOC's treatment of Plaintiff's illnesses boiled down to ODOC hoping Plaintiff would just get over it.

27. For example, in 2012, Plaintiff requested an accommodation for turn faucets, instead of push button faucets. Turn faucets had been available to him at some ODOC facilities. As explained above, using a push button faucet or toilet caused him immense pain as he had to contort his fingers in order to push the button because of his rheumatoid arthritis. In response to his accommodation request, nurse B. Whelan wrote, "[t]his institution has no turn faucets. You will need to adapt the best you can."

28. As another example, Plaintiff requested that if he is to be placed in restraints, he asked that officers use "double cuffs"—handcuffs that would be double the length of one set of handcuffs—because bringing his arms together in regular length cuffs creates a pinching in his back that causes a great deal of pain given his back, shoulder, and neck issues. In response to this accommodation request, nurse B. Whelan wrote, "Mr. Benson, wrist and ankle restraints are not a medical issue. If security has difficultly putting cuffs on, they can make adjustments. There was found to be no medical need when your file was reviewed by the practitioners. I cannot order double cuffs." Although Whelan later confirmed that Plaintiff previously had an order for double cuffs, Whelan explained that it was discontinued because he did not have an "acute medical need." Whelan reiterated, "[r]estraints are a security concern, not health services."

29. As another example, Plaintiff had been approved to have minor additional comforts to ease his severe and persistent pain, including specialized shoes, an additional pillow, and bottom tier and bottom bunk restrictions. While he had been able to use these items for years, the TLC Committee ultimately denied these therapeutic measures for no discernable reason. ODOC also removed his bottom tier and bottom bunk restriction despite his limited mobility.

30.     When Plaintiff reached out to medical staff about his mobility issues, he explained that on his right foot, he is only able to walk on his big toe. L. Gruenwald, NP responded to his kyte, "I think that if you can get into a fight with another inmate and fight staff, then you don't need anything because I think it shows you are just fine."

31.     Medical staff would also switch out his medications without evaluating him or consulting with him. For example, after switching out his medication and giving him prednisone, Plaintiff wrote to medical staff explaining that prednisone causes him severe side effects including elevated blood sugar reaching levels of 500 or more, extreme blood pressure swings, hot flashes, and dizziness. On 5/1/2012, L. Gruenwald, NP responded, "side effects do not constitute an allergy, but you may discuss concerns regarding this medication with a nurse at sick call."

32.     Plaintiff tried to advocate for his own health at every juncture, only to be shut down by medical staff and delayed from getting care. On 6/19/2014, following back surgery, an outside physical therapist evaluated Plaintiff and noted "a lot of problems." The PT developed an in-cell exercise plan but noted that continued PT sessions would require TLC approval, and the PT's recommendations were forwarded to Dr. Gulick. No follow-up PT was ever documented. Just days later, on 6/24/2014, Plaintiff submitted a kyte requesting a physical therapy appointment. Rather than addressing the outstanding TLC referral or the PT's documented findings, T. Carnig, RN dismissed the request by noting that Plaintiff had already had a PT appointment, and told him, "[y]ou can do so much for yourself, Mr. Benson. Push yourself."

33.     Continually, to the day of his release, it was on Plaintiff to make sure that medical staff were ordering his medications and often his prescriptions would lapse between orders causing him to hard stop critical medications. In a kyte to medical staff reminding them to refill his prescriptions so they did not lapse, Plaintiff reported being almost 100% debilitated and in

extreme, severe, and persistent pain throughout his body. On 11/2/2015, he got a response from Health Services telling him, "[d]o not take every dose," and rather than evaluating him before changing his medication, Health Services staff added, "I will be weaning this med off over the next months."

34.     These years of treatment demonstrate the ongoing neglect that Plaintiff had already been facing while in ODOC custody.

### C. More Recent Medical History and Denial of Care

35.     Throughout his incarceration, Plaintiff's documented medical conditions—including multiple spinal surgeries, post-surgical hemiparesis, chronic pain, and severe mobility impairments—made physical therapy a medically necessary component of his care. Yet ODOC systematically did not provide Plaintiff with the physical therapy his outside treating providers recommended, repeatedly limiting or eliminating PT approvals through the TLC Committee process and never establishing or maintaining a documented PT plan of care.

36.     In May 2017, an outside physical therapist evaluated Plaintiff and documented significant findings: limited cervical spine motion, neuropathy in both arms, limited strength, and—critically—loss of bowel and bladder control and decreased sensation, warranting urgent provider evaluation of the lumbar spine. The PT recommended five weekly sessions over five weeks to improve cervical motion and decrease pain, as well as provider evaluations for both the vision and lumbar symptoms before PT could continue. This report was not acted on by ODOC medical staff until June 8, 2017—over two weeks after it was issued. When ODOC finally acted, TLC approved only two PT visits, less than half the minimum recommended by Plaintiff's treating physical therapist.

37.     Following Plaintiff's July 2020 assault and TBI hospitalization, an outside physical therapist evaluated him on August 14, 2020. The PT documented devastating findings: hemiparesis of the left lower extremity, ataxia, no trace muscle activity to the left lower extremity, sensation limited to the plantar surface of the foot only, and a sitting tolerance of just one minute, accompanied by complaints of vertigo, nausea, and dyskinesias. Based on these findings, the PT recommended three PT visits per week. The TLC Committee approved four total treatments—the equivalent of less than two weeks at the recommended frequency.

38.     Plaintiff's PT sessions continued from August through October 2020, with his outside PT recommending continued visits at each appointment. At every turn, TLC approvals lagged far behind clinical recommendations. When Plaintiff returned to outside PT in March and May 2021, he reported that his pain medications—including Baclofen—had been discontinued, causing increased pain with any activity. The Physical Therapist continued to recommend additional visits. By May 7, 2021, Plaintiff was discharged from PT with only a home exercise program. There is no documentation that ODOC nursing staff ever monitored or followed up on that program, or that the discharge from PT was accompanied by any updated plan of care.

39.     Post-surgical PT following Plaintiff's 2014 lumbar surgery and 2016 thoracic and cervical spinal surgeries were severely delayed and inadequate relative to what his surgical discharge orders required. With each missed or delayed PT regimen, Plaintiff's condition worsened and would require even more corrective therapy.

40.     Throughout Plaintiff's incarceration, no ODOC care plan or plan-of-care updates were ever documented in connection with PT findings. The significant gaps between PT discharge and the next referral went unmonitored, and ODOC never established any structured PT program commensurate with Plaintiff's documented surgical history and functional deficits.

41.    Defendant Coffey was aware of Plaintiff's health condition and struggles receiving care while in ODOC's custody. She both received calls from Plaintiff's loved ones and attended health appointments with Plaintiff.

42.    One such incident was in May 2022. Defendant Coffey was aware that Plaintiff was in pain and that his pain was contributing to a deterioration of rapport with his primary care provider. Defendant Coffey attended an appointment with Plaintiff and his primary care provider where Plaintiff expressed the excruciating pain he was suffering from, and his desire to be treated humanely. His primary care provider stopped working with him in June 2022. It is unclear from the medical records whether he ever had a new primary care provider assigned.

43.    On a 3/27/2023 X-ray, doctors found "Lower thoracic fusion from T11-L1 with posterior rods and interpedicular screws that remain intact" and "Stable mild anterior loss of vertebral body stature at T12." Around this time, Plaintiff reported being in constant daily pain that affected every single part of his life and day-to-day living. Staff never addressed Plaintiff's pain.

44.    By the time of his release, ODOC medical staff did not have a comprehensive, documented pain management plan. ODOC never fully implemented Dr. Walker's pain management recommendations from 2021, where he recommended epidural steroid injections, appropriate medications, and a structured exercise program.

45.    By the time of his release, ODOC still had not provided Plaintiff with proper postoperative follow-up with OHSU neurosurgery after his 2016 spinal surgeries, nor had it provided the structured physical therapy that his post-surgical condition required. Despite documented recommendations from outside physical therapists dating back to 2014—and repeated TLC approvals of far fewer PT sessions than were recommended—Plaintiff left ODOC custody without ever having received a comprehensive, supervised PT program commensurate

with the severity of his surgical history and functional deficits as presented at the time of his release.

46.    By the time of his release, Plaintiff was still waiting on rheumatology and pain specialist appointments that had been repeatedly deferred. These should have been completed years earlier.

47.    Plaintiff left ODOC custody with dangerously high HbA1c levels, indicating that his diabetes was poorly controlled. A stable, monitored diabetes management plan should have been in place.

48.    Throughout his incarceration and up to his release, Plaintiff received inconsistent, or was outright denied, mobility and ADA accommodations. Plaintiff should have received properly fitted equipment including his wheelchair, walker, brace, pillow, and medically necessary footwear should have been consistently provided.

49.    Though ODOC routinely credits his demeanor as an impediment to care, ODOC did not provided adequate mental health care to treat Plaintiff's PTSD, depression, and anxiety. A proper psychiatric medication regimen and transition plan to community mental health services should have been established.

50.    In the months leading up to his release from custody, medical staff noted significant functional deficits, including needing caregiver assistance for transfers, showering, toileting assistance, and that he would have complete dependence for activities like cooking and shopping.

51.    On January 19, 2024, medical staff noted in a progress note "continued to complain & says he will get better care on the outside. Wished him luck in trying to find the medications he desires. I am concerned about his long term prognosis."

52. Later, on February 22, 2024, medical staff noted "I foresee bad things after parole due to his low pain tolerance & need to eliminate all pain, which is unrealistic & will cause problems."

53. Staff did not implement proper transition planning. Although staff expressed concern about his long-term prognosis given his pain management expectations, the reality is that his "unrealistic expectations" were the result of decades of inadequate treatment that left him with undertreated, severe, and complex medical needs.

54. Plaintiff had to be released from prison to a 24-hour care home. He spent the intervening years since release prior to reincarceration finally attending to his long neglected medical needs. He finally received adequate physical therapy, diabetic care, rheumatological care, pain management, and mental health therapy. While difficult, he was slowly regaining the strength that he had lost from years of neglect.

55. The entire ordeal caused Plaintiff unnecessary, grueling pain and suffering. He had to seek medical treatment after his release that could have been avoided had he received adequate care in the decades prior to release.

56. Defendant Coffey personally participated in Plaintiff's medical care, and was aware of the unconstitutional care he was receiving. Despite her authority and obligation to ensure adequate care for Plaintiff, she did not intervene to stop the continuous failure to provide him care.

57. Defendant Roberts's systemic practices directly caused and prolonged the denials of care that Plaintiff experienced throughout his incarceration. The years-long delays in Plaintiff's specialist referrals—including rheumatology, pain management, and neurosurgery follow-up— were the foreseeable product of Roberts's mismanagement of the TLC Committee and OOF trip processes. The TLC Committee's unexplained denial of Plaintiff's approved therapeutic

measures, including specialized footwear, additional pillow, and bottom tier and bottom bunk accommodations, reflects the same pattern of cost-driven denial that Roberts institutionalized across the ODOC system. Roberts's failure to implement or enforce a continuous plan of care for an adult in custody with Plaintiff's well-documented, complex, and chronic medical needs constituted deliberate indifference to a known and serious risk of harm.

**FIRST CLAIM FOR RELIEF**
**(Eighth Amendment —against Individually-Named Defendants and John Does 1-50)**

58.    Plaintiff realleges the factual allegations set forth above.

59.    The Eighth Amendment of the United States Constitution protects incarcerated people from cruel and unusual punishments, which includes deliberate indifference to serious medical needs.

60.    Defendant Coffey and the John Doe Defendants were deliberately indifferent to Plaintiff's serious medical needs by failing to provide timely and appropriate treatment for his well-documented, chronic, and debilitating conditions; failing to maintain any continuous or coordinated plan of care over the course of his decades-long incarceration; and otherwise denying and delaying medically necessary care for cost-related reasons and not clinical ones.

61.    Defendant Roberts was deliberately indifferent to Plaintiff's serious medical needs in the following respects: (a) by requiring his personal approval—through the TLC Committee process—for all medically necessary care, including care that ODOC's own policies authorized treating practitioners to provide directly, thereby creating systemic and unnecessary delays and denials in care; (b) by mismanaging the OOF trip process and failing to ensure that specialist referrals for adults in custody, including Plaintiff, were scheduled and completed in a timely manner, despite his actual knowledge that OOF trips were being dangerously mishandled; (c) by retaliating against physicians who objected to his practices, reducing available medical staffing

and compounding delays in Plaintiff's care; (d) by implementing and maintaining a system designed to deny and delay medically necessary care for cost-reduction purposes; (e) by failing to ensure that any continuous, individualized plan of care was developed or maintained for Plaintiff, despite years of documented, complex, chronic illness; and (f) by using the TLC Committee process to systematically limit or deny physical therapy approvals that fell far short of what Plaintiff's outside treating physical therapists recommended, including approving only two PT visits in 2017 when five weekly visits were clinically indicated, and approving only four total PT treatments in 2020 when three visits per week were recommended following a TBI with documented hemiparesis and near-total loss of left lower extremity function.

62.    The actions and omissions of defendants were the direct and proximate cause of Plaintiff's physical and emotional injuries, including severe and chronic pain, progressive functional deterioration, and his condition upon release as functionally immobile and wheelchair bound.

63.    The actions of Defendant Roberts, as described in this complaint, was embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of his intentional conduct, Plaintiff is entitled to punitive damages against Defendant Roberts in an amount sufficient to punish them and to deter others from like conduct.

64.    Plaintiff is entitled to all of his damages, economic and non-economic, in an amount to be ascertained according to proof at trial.

**SECOND CLAIM FOR RELIEF**
**(State Tort — Medical Negligence — against State of Oregon)**

65.    Plaintiff realleges the factual allegations set forth above.

66.    Defendant State of Oregon owed Plaintiff a heightened and special duty of reasonable care, as he was a ward and not capable of caring for himself. It was foreseeable that failing to

COMPLAINT
Page 15 of 16

provide him proper medical care would result in the serious, continuous injury from which he now suffers.

67.     In taking the actions described above, the agents of State of Oregon breached the duty of care it owed to Plaintiff.

68.     But-for Defendant State of Oregon's breach of care, Plaintiff suffered the injuries described above.

69.     Plaintiff will likely incur medical bills following his incarceration owing to Defendant State of Oregon's negligent acts and omissions, and/or be made liable for his medical bills by ODOC per OAR 291-203-0040. He will also likely incur future medical bills because of the loss caused by Defendants.

70.     As a direct and proximate result of the defendants' acts or omissions, Plaintiff has incurred economic and non-economic damages in an amount to be determined by a jury.

## RELIEF SOUGHT

71.     WHEREFORE Plaintiff prays for judgment as follows:

    A.  Award compensatory damages against all defendants;

    B.  Award punitive damages against Defendant Roberts;

    C.  Award reasonable costs and attorney fees; and

    D.  Grant such other relief as this court deems just and equitable.

DATE:  March 6, 2026.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
*LEAD ATTORNEY*

**Attorney for Plaintiff**

COMPLAINT
Page 16 of 16